IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| ACG PIZZA PARTNERS, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 5:14-CV-174 (MTT) |
| | ) |
| MYKULL ENTERPRISES, INC., and MICHAEL EUGENE ELLIS, | ) |
| | ) |
| Defendants. | ) |

## ORDER

This action involves a dispute between a franchisor and franchisee of Stevi B's Pizza Buffet restaurants. Before the Court is the Plaintiff's motion for preliminary injunction to stop the Defendants from using Stevi B's trademarks. (Doc. 10). The Court held a hearing on the Plaintiff's motion on August 19, 2014. For the following reasons, the motion is **GRANTED**.

### I. FINDINGS OF FACT

Based on the evidence produced prior to and during the hearing, and for the purpose of ruling on the Plaintiff's motion for preliminary injunction, the Court finds as follows:

The Stevi B's business model consists of family restaurants specializing in all-you-can-eat pizza and salad buffets prepared in accordance with particular recipes and procedures. (Doc. 1, ¶¶ 6, 7; Doc. 11-1, ¶¶ 4, 5). This business model and related intellectual property rights are licensed to others through written franchise agreements.

In exchange for these rights, franchisees agree to pay their franchisor a recurring royalty based on a percentage of their gross receipts.  (Doc. 1, ¶ 8; Doc. 11-1, ¶ 6).

The Plaintiff acquired the Stevi B's business model and associated trademarks in 2007 from Stevi B's Enterprises, Inc., a nonparty to this case.  Through this transaction, the Plaintiff also received an assignment of Stevi B's Enterprises's then-existing franchise agreements and contract rights, which included the Franchise Agreement with Mykull Enterprises as well as the lease and sublease for the shopping center space in which the Defendants' restaurant operates.[1]  (Doc. 1, ¶¶ 9-10, 14; Doc. 11-1, ¶¶ 7-8).  Mykull Enterprises's obligations under the Franchise Agreement were personally guaranteed by Defendant Michael Ellis, who previously executed a written guaranty to that effect.  (Doc. 1, ¶ 11; Doc. 1-1 at 73-76; Doc. 11-1, ¶ 10).

Termination of the Franchise Agreement ends the Defendants' right and license to use the Stevi B's business system and related trademarks.  (Doc. 1, ¶¶ 17-18; Doc. 1-1 at 51-52; Doc. 1-2 at 3, 5; Doc. 11-1, ¶ 14).  The Franchise Agreement's terms provide that it "shall terminate automatically upon delivery of written notice of termination" to the Defendants if, in pertinent part,

- the Defendants fail two or more times within a year to comply with the terms of the Agreement, regardless of whether these failures are corrected after they receive notice of the breach  (Doc. 1-1 at 48, § XVI. B. 11.);

---

[1] Under the Franchise Agreement, except for claims related to the Plaintiff's trademarks, "[a]ny claim arising out of or relating to [the] Agreement, or any breach thereof…shall be submitted to arbitration…." (Doc. 1-1 at 68, § XXX. A.).  All other claims in this action, with the possible exception of interim relief regarding payment of rents, should be resolved in accordance with the Parties' agreement to arbitrate.

- the Defendants become insolvent or commit any affirmative act of insolvency (Doc. 1-1 at 48, § XVI. B. 8.);
- a final judgment against the Defendants remains unsatisfied for 30 days or more (Doc. 1-1, § XVI. B. 8.); or
- a lawsuit to foreclose any lien or mortgage against the restaurant premises or equipment is filed against the Defendants and is not dismissed within 30 days (Doc. 1-1 at 48, § XVI. B. 8.).

Moreover, the Agreement automatically terminates without further action by the Plaintiff or notice to the Defendants if the Defendants fail or refuse to pay royalty fees due to the Plaintiff. (Doc. 1-1 at 49, § XVI. C. 1.).

On April 28, 2014, the Plaintiff notified Ellis it was terminating the Franchise Agreement. (Doc. 1-3; Doc. 11-1, ¶¶ 12, 16). According to the notice, termination was authorized at that time because the Defendants

> have not operated the franchised business in accordance with the franchise agreement on two or more occasions in the prior year; (2) have deceived [the Plaintiff] concerning [their] actual sales and, when caught, failed to account to [the Plaintiff] for the unreported revenues; 3) are insolvent; and (4) have pending against [them] one or more lawsuits seeking to foreclose a lien or mortgage against [their] business premises or equipment.

(Doc. 1, ¶ 16; Doc. 1-3 at 3; Doc. 11-1, ¶ 13). Despite the letter of termination, the Defendants continue to operate the restaurant using Stevi B's trademarks.

**A. The Defendants' pre-termination conduct**

The Court finds the Plaintiff's termination of the Franchise Agreement was proper for several reasons:[2]

First, the Defendants first violated the Franchise Agreement by not following the Plaintiff's standards for franchise trade dress.  Under the Agreement, the Defendants are required to "maintain the condition and appearance of the [restaurant] consistent with [the Plaintiff's] quality controls and standards."  (Doc. 1-1 at 33, § XII. C.). According to testimony of the Plaintiff's then-CEO, Matthew V. Loney, while operating the franchise the Defendants installed chairs that were not consistent with the brand standards set by the Plaintiff.  In October 2013, Loney sent Ellis a letter notifying him he was in default of the Franchise Agreement because the chairs were inconsistent with the Plaintiff's trade dress and therefore did not comply with the Plaintiff's standards of quality and performance.  (Doc. 39-3).  Ellis conceded during the hearing that he had installed unapproved chairs.

The Defendants next violated the Agreement by serving unauthorized food.  The Agreement mandates that the Defendants

> offer for sale and sell at the [restaurant] all types of Menu Items and other categories of food and beverage products that [the Plaintiff] from time to time authorizes *and shall not offer for sale or sell at the [restaurant] any other category of products* or use [the premises] for any purpose other than the operation of a Franchised Restaurant in full compliance with this Agreement.

---

[2] Again, the Court makes these findings solely for the purpose of ruling on the Plaintiff's motion for a preliminary injunction.

(Doc. 1-1 at 34-35, § XII. G.) (emphasis added).  Loney testified that the Defendants sold unapproved food products – soup and submarine sandwiches – alongside standard Stevi B's food offerings.  In January 2014, Loney sent notice to the Defendants that they were in default of the Franchise Agreement for the second time because they were selling these unapproved menu items.[3]  (Doc. 39-6).  During the hearing, Ellis admitted that he had sold soup and submarine sandwiches at the restaurant.

      The Defendants further violated terms of the Franchise Agreement by using an unauthorized point-of-sale system.  The Agreement obligates the Defendants to pay to the Plaintiff, "without offset, credit or deduction of any nature…a weekly Royalty Fee equal to five percent of the Net Sales derived from the [restaurant]."  (Doc. 1-1 at 28, § X. A.).  To accomplish this, the Agreement requires the Defendants to obtain and use computer hardware and software specified by the Plaintiff to record and report net sales and to transmit that sales data electronically to the Plaintiff.  (Doc. 1-1 at 31-32, § XI. D.).  The Plaintiff is entitled to full and direct access to the Defendants' point-of-sale system, in person and electronically.  (Doc. 1-1 at 31-32, § XI. E.).  Further, the Defendants agreed "not to use any point of sale software in the operation of the Restaurant that [the Plaintiff] has not approved."  (Doc. 1-1 at 31-32, § XI. D.).

      Nevertheless, the Defendants set up a separate cash register and credit card machine outside of the point-of-sale system the Plaintiff relied on to capture weekly sales figures.  The Plaintiff contends Ellis hid sales by using the additional equipment.  An employee of the Plaintiff surreptitiously photographed the unauthorized register and

---

[3] The date on the letter is 2013.  However, Loney testified, without contradiction, that the date was a typo and that the letter was actually delivered in 2014.

credit card machine while visiting the Defendants' restaurant in January 2014 and notified Loney. (Doc. 39-4). That same month, Loney requested Ellis provide "all banking and credit card information pertaining to the non-approved credit card machine, as well as the [unapproved cash register's] Z Tape." (Doc. 39-8). Loney testified the "Z Tape" was necessary for the Plaintiff's royalty calculations because the register the Defendants were using was an older model that recorded its sales on the paper tape rather than online. However, despite numerous requests, Loney says the Defendants never provided the Z Tape or other requested financial information.

The Defendants do not deny using the equipment. But Ellis, in his testimony, contended he used the unsanctioned register and credit card machine only as a back-up when the networked registers broke down. He claims that all sales rang through the Plaintiff's point-of-sale system and that he had no Z Tape to provide. The Court does not find Ellis's explanation credible. There is no indication he has previously taken this position. In fact, on cross examination, Ellis admitted he never told Loney that the register was merely a back-up because he did not think he was required to tell him that. Consequently, the Court concludes Ellis was operating an unmonitored cash register and credit card machine in violation of the Franchise Agreement that allowed him to hide sales from the Plaintiff. Ellis compounded his violation of the Franchise Agreement by not providing the Plaintiff with the information it requested regarding the Z Tape and other financial documents.

In addition to operating the restaurant in a prohibited manner, the Defendants are insolvent, face a lawsuit to foreclose on their restaurant equipment, and did not timely notify the Plaintiff of the legal actions against them. In November 2013, Financial

Pacific Leasing, Inc. sued the Defendants after they stopped making payments on a soft serve ice cream machine they had leased.  (Doc. 39-15).  The Defendants also defaulted on a $1.1 million small business loan from Wells Fargo, and the bank sued them in January 2014 seeking to enforce its security interest in their restaurant equipment.  (Doc. 39-7).  The bank separately filed suit for damages seeking to recover the outstanding balance of more than $630,000.00.  (Doc. 39-16).  Finally, another creditor notified the Defendants in January 2014 that because they had not made required payments since September 2012, they were in material breach of a payment plan they agreed to when financing the purchase of their franchise.  (Doc. 39-9).  Consent judgments were entered against the Defendants in favor of Financial Pacific on April 24, 2014 and in favor of Wells Fargo on May 23, 2014 in amounts that totaled more than $723,000.00.  (Doc. 39-15; Doc. 39-16).

During the preliminary injunction hearing, Ellis acknowledged that he has a lot of debt and that it would be very difficult for him to continue to operate.  He said he has not come to arrangements with any of his creditors.  Ellis claimed to be unaware of a September 2014 hearing the Plaintiff argued Wells Fargo has set because it is seeking a writ to take possession of the equipment in his restaurant.  Even though Ellis argues his business can ultimately survive despite these financial pressures, it is clear the Defendants are insolvent under the terms of the Franchise Agreement.  Moreover, the Defendants did not notify the Plaintiff of these lawsuits "in writing within five (5) days of the commencement of any action, suit or proceeding…which may adversely affect the operation or financial condition of [their restaurant]."  (Doc. 1-1 at 38-39, § XII. S.).

### B. The Defendants' post-termination conduct

After the notice of termination, the Defendants continued to operate outside the terms of the Agreement. Under the Agreement, the Defendants must "purchase and use Trade Secret Food Products from [the Plaintiff] or a limited number of suppliers so authorized by [the Plaintiff]." (Doc. 1-1 at 34, § XII. F.). Since delivery of the termination letter, the authorized supplier of Stevi B's dough and sauce has stopped delivering to the Defendants because they owed the supplier more than $16,000. (Doc. 39-13). The practical effect of this, according to Loney, is that the Defendants are unable to make and sell Stevi B's-authorized food. This also keeps the Plaintiff from being able to verify the source and quality of the ingredients the Defendants are using. Although Ellis claims he has started to repay the supplier, there is no indication that deliveries have resumed.

Similarly, the Agreement allows for termination if the Defendants "operate[ ] the Franchised Restaurant in a manner that presents a material health or safety hazard to its customers or the public." (Doc. 1-1 at 49, § XVI. B. 12). After delivery of the letter of termination, the Defendants' pest control provider canceled its service due to nonpayment and sent the account to collection. According to a letter from the company, the Defendants' restaurant has not been serviced since April 2014 despite the fact that an assistant manager of the restaurant has mentioned many times that service was "desperately" needed. (Doc. 39-14).

## II. CONCLUSIONS OF LAW

"[T]o succeed in a motion for a preliminary injunction the plaintiff must establish four elements: (1) likelihood of success on the merits; (2) irreparable harm; (3) that the

harm to the plaintiff outweighs the harm to the defendant and (4) that the public interest favors the injunction." *Jomaps, LLC v. D-Mand Better Prods., LLC*, 2012 WL 5235533, at *4 (N.D. Ga.) (citing *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001)).

### A. Likelihood of success on the merits

The Plaintiff's likelihood of success depends on the validity of its infringement claim. To prevail on an infringement claim, the Plaintiff "must show that its mark was used in commerce by the defendant without [the Plaintiff's] consent and that the unauthorized use was likely to deceive, cause confusion, or result in mistake." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1307 (11th Cir. 1998). In the context of a dispute between a franchisor and a franchisee, this means the Plaintiff must show "that [it] properly terminated the contract purporting to authorize the trademarks' use, thus resulting in the unauthorized use of trademarks by the [Defendants]." *Id.* at 1308. Moreover, the Plaintiff's right to terminate the Franchise Agreement with the Defendants exists independently of any claims the Defendants might have against it; the Plaintiff may terminate when the terms of the Agreement are violated. *Id.* at 1309.

In *McDonald's*, for example, numerous inspections revealed the franchisee was not meeting McDonald's cleaning and sanitation standards. The franchisee contended that McDonald's was using the inspections as an excuse for terminating the franchise agreement because the franchisee had rejected McDonald's request to move the restaurant to a new location. *Id.* at 1308-09. This made no difference to the Court, which held that the franchisee's "failure to comply with McDonald's…food safety standards constituted a material breach of the franchise agreement sufficient to justify

termination, and thus, it does not matter whether McDonald's also possessed an ulterior, improper motive for terminating the…franchise agreement." *Id.* at 1309.

In this case, the Plaintiff has presented evidence of numerous breaches of the Franchise Agreement by the Defendants that authorized its termination, including (1) the use of dining room chairs that did not comply with the Plaintiff's standards; (2) their sale of soup and submarine sandwiches, which were not authorized menu items; (3) their use of an unauthorized cash register and credit card machine and refusal to account to the Plaintiff for their actual sales; (4) their insolvency, as indicated by their significant debt and creditors' lawsuits seeking to repossess restaurant equipment and other collateral that would render the business inoperable; and (5) their failure to timely notify the Plaintiff of the lawsuits against them.  To that end, the Plaintiff properly terminated the Agreement under §§ XVI. B. 8., XVI. B. 11., and corresponding clauses that outline the performance expectations of the Defendants.

Although the Defendants deny the Plaintiff legally terminated the Agreement, they have provided little evidence in support of their position.[4]  Instead, the Defendants raise an unrelated issue – the opening of another Stevi B's restaurant a few miles away from their own.  Ellis testified that since the second restaurant opened, he has seen a sharp decline in business, and he speculates that the Plaintiff has the ultimate goal of forcing him to sell his stake in the franchise at a deeply discounted price.  Ellis further contended that the prior owner of his franchise orally promised him he would be given a

---

[4] Moreover, the Defendants never formally responded to the Plaintiff's motion for preliminary injunction.  Instead, they have relied on Ellis's testimony during the hearing and an unsigned affidavit he attached to his answer.  (Doc. 14-1).  With regard to that affidavit, Ellis has since moved to file a signed copy.  (Doc. 30; Doc. 30-1).  That motion is **GRANTED**.

right of first refusal before any new Stevi B's restaurants opened in the area. But clearly this individual, who obtained the franchise not from the Plaintiff but from the Plaintiff's predecessor, Stevi B's Enterprises, Inc., cannot bind the Plaintiff to this promise. Moreover, the Franchise Agreement makes clear that the Defendants have no territorial rights and that there are no radius restrictions that govern where another Stevi B's restaurant might open. By the terms of the Agreement, the Defendants acknowledge the Plaintiff has "no express or implied duty to insulate or protect [the Defendants'] revenues from erosion or cannibalization as a result of the Franchised Restaurant competing with other Stevi B's Pizza Restaurants…" (Doc. 1-1 at 7, § I. B.).

In any event, it is not enough for the Defendants to rely on allegedly ulterior motives the Plaintiff had for ending the relationship. Even if the Plaintiff used the terms of the Agreement to its advantage because it hoped to obtain the Defendants' franchise at a discounted price, the fact remains that the Defendants breached the Franchise Agreement. As in *McDonald's*, in the face of material breach of the Agreement, the Plaintiff's actual motive for termination is inconsequential.

Accordingly, the Court finds that the Plaintiff is likely to prevail on the merits of its infringement claim because it can show the Franchise Agreement was properly terminated.

### B. Irreparable harm

The Eleventh Circuit has held that "a sufficiently strong showing of likelihood of confusion [caused by trademark infringement] may by itself constitute a showing of ... [a] substantial threat of irreparable harm." *McDonald's*, 147 F.3d at 1310 (quoting *E. Remy Martin & Co. v. Shaw-Ross Int'l Imports*, 756 F.2d 1525, 1530 (11th Cir. 1985))

(quotation marks omitted). "By its very nature, trademark infringement results in irreparable harm because the attendant loss of profits, goodwill, and reputation cannot be satisfactorily quantified and, thus, the trademark owner cannot adequately be compensated." *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 640 (1st Cir. 1992). The Eleventh Circuit cautions that under Supreme Court precedent, it is unclear whether courts may presume irreparable harm "*merely* because a plaintiff in an intellectual property case has demonstrated a likelihood of success on the merits." *North Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1227 (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)) (emphasis added).[5]

Here, however, beyond the simple fact of infringement and inherent damage caused by unauthorized use, the Plaintiff is irreparably harmed to the extent it faces injury to its reputation and loss of customers because of the Defendants' distribution in the Plaintiff's name of a different or inferior product. *See McDonald's*, 147 F.3d at 1310. As Loney stated, brand standards "are the lifeblood of restaurant franchises," and the value in the Plaintiff's brand is developed through the consistency it achieves in the look and feel of its restaurants and in the food each serves. Loney testified about the harm the Plaintiff faces by the Defendants' continued operation under their Stevi B's brand: Because they have lost access to Stevi B's dough and sauce supplies, the Defendants are physically incapable of serving to customers a Stevi B's pizza; their inability to pay for pest control service creates a potential health hazard that customers will attribute to

---

[5] In *eBay*, a patent case, the Supreme Court underscored the need to exercise traditional principles of equity by evaluating the existence of irreparable harm and not applying a blanket rule that injunction automatically follows a determination of likely infringement. 547 U.S. at 392-93.

the brand; and due to the "financial tsunami" of their insolvency, the Defendants will deliver a steadily deteriorating quality of service and face closure or disruption to their operations. Once customers' loyalty is lost, it is difficult to win them back, Loney observed. Because customers of Stevi B's have a certain expectation of the experience the restaurant will provide, the Defendants' inability to meet this expectation will, in the ways Loney outlines, irreparably damage the brand and what it stands for.

Consequently, the Court finds the Plaintiff would face irreparable harm if the Defendants were allowed to continue using Stevi B's trademarks after the termination of the Franchise Agreement.

### C. The harm to the Plaintiff outweighs the harm to the Defendants

Franchisees who breach the terms of their franchise agreements cannot complain of harm from an injunction that prevents their further use of the franchisor's trademarks. *Dunkin' Donuts Franchised Rests. LLC v. D&D Donuts, Inc.*, 566 F. Supp. 2d 1350, 1361-62 (M.D. Fla. 2008). *See also S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 379 (3d Cir. 1992) (the self-inflicted harm of a franchisee who stops his own performance under the contract is substantially outweighed by the "immeasurable damage" done to the infringement of the franchisor's trademark).

Here, an injunction will almost certainly bring an end to the Defendants' business as a Stevie B's franchise. As Ellis testified, he has invested heavily in the business and the loss of that investment *has*[6] been devastating to him. Still, the Defendants brought about the termination of the franchise based on their own inability or unwillingness

---

[6] As discussed, the Defendants were in severe financial distress before the Plaintiff terminated the Franchise Agreement.

comply with the Franchise Agreement. Thus, the harm they face in losing their business, though unfortunate, is of their own doing, and is outweighed by the damage they do to the Plaintiff by using its trademarks without permission.

Accordingly, the Court finds the harm posed to the Plaintiff by the Defendants' unauthorized use of Stevi B's marks outweighs the harm the Defendants face from an injunction prohibiting the marks' use.

### D.  The public interest favors an injunction

The public interest is served by preventing consumer confusion in the marketplace. *Davidoff & CIE, S.A. v. PLD Intern. Corp.*, 263 F.3d 1297, 1304 (11th Cir. 2001). To allow the Defendants to continue operating a Stevi B's restaurant after the Plaintiff lawfully revoked its authorization would sow confusion among consumers. Therefore, the Court finds it in the public interest that the Defendants not be permitted to continue their unauthorized use of Stevi B's marks.

### III. CONCLUSION

Because the standards for issuing a preliminary injunction have been satisfied, the Plaintiff's motion for preliminary injunction (Doc. 10) is **GRANTED**. Accordingly, for the reasons stated above and during the hearing on the Plaintiff's motion, the Court **ORDERS** as follows:

Mykull Enterprises, Inc. and Michael Eugene Ellis, their agents, servants and employees, and those people in active concert or participation with them, are enjoined from:

1. Using the Plaintiff's marks, including "Stevi B's Pizza," or any trademark, service mark, logo, or trade name that is confusingly similar thereto;

2. Otherwise infringing upon the Plaintiff's marks or using any similar designation, alone or in combination with any other components;

3. Causing a likelihood of confusion or misunderstanding as to the source or sponsorship of the Defendants' business or services; and

4. Causing a likelihood of confusion or misunderstanding as to the Defendants' affiliation, connection, or association with the Plaintiff and its franchisees or any of their services.

Under Fed. R. Civ. P. 65(c), the effectiveness of this preliminary injunction is conditioned upon the Plaintiff's posting a good and sufficient bond in the amount of **$100,000** for payment of costs and damages that may be incurred or suffered by the Defendants if they are found to be wrongfully enjoined or restrained. The terms of this Order shall take effect upon the Plaintiff's posting of the necessary bond.

**SO ORDERED**, this 28th day of August, 2014.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT